AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

LODGED
CLERK, U.S. DISTRICT COURT

12/11/2020

CENTRAL DISTRICT OF CALIFORNIA
BY:     DM     DEPUTY

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

DEC 11 2020

CENTRAL DISTRICT OF CALIFORNIA
BY         DEPUTY

United States of America

v.

DREW ALARCON,

Defendant.

Case No. 2:20-mj-06021

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 10, 2020, in the county of Los Angeles in the Central District of

California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a), (b)(1)(A)(v) | Possession of a Controlled Substance (LSD) with Intent to Distribute |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/S/ Katelyn Thompson*
Complainant's signature

Katelyn Thompson, NCIS, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     12/11/20

Judge's signature

City and state:  Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT**

I, Katelyn M. Thompson, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Drew ALARCON ("ALARCON") for a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(v) (Possession with Intent to Distribute a Controlled Substance, Lysergic Acid Diethylamide ("LSD")) on December 10, 2020.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3.   I am a Special Agent with the Naval Criminal Investigative Service ("NCIS").  I am an investigator and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7).  I am empowered by law to conduct investigations of, and make arrests for, the federal felony offenses enumerated in Title 18, United States Code, Section 2516.

1

4.    I have been employed as a Special Agent ("SA") of the NCIS since June of 2017, and currently am assigned to the NCIS Resident Agency Camp Pendleton, CA Special Proactive Operations Squad ("SPOS").   Previously, I was a Border Patrol Agent assigned to Calexico, CA with the Department of Homeland Security ("DHS") from 2015 to 2017, and a Transportation Security Officer assigned to San Diego, CA with DHS from 2014 to 2015.   I have attended multiple federal law enforcement academies, to include the Federal Law Enforcement Training Center located in Glynco, GA, where I received instruction in criminal and constitutional law, crime scene processing, interviews and interrogations.   I am a graduate of the University of North Alabama's Criminal Justice program, obtaining a Bachelor of Science degree in Criminal Justice and a minor in Security and Emergency Management, cum laude.

5.    I have specialized training and experience in Undercover Agent operations and the investigation of major narcotics trafficking organizations involved in violent crime, conspiracy crimes, and narcotics importation and distribution. During my tenure in law enforcement, I have participated in the execution of multiple search warrants relating to violations of federal, state and military laws and have received extensive training regarding the collection and preservation of evidence. Additionally, I have participated in the debriefing of defendants and informants who had personal knowledge regarding major narcotics trafficking organizations, including cartels based in Mexico.   I have also conducted and participated in many

2

aspects of drug investigations, including the conducting of surveillance.  I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, and the collection of money that represents the proceeds of narcotics trafficking.

6.   I am also familiar with the sophisticated methods that drug organizations use to avoid detection by law enforcement, such as the use of multiple cellphones, pre-paid calling cards, counter-surveillance measures, established relationships with legitimate businesses to hide drugs and launder drug proceeds, vehicles with concealed compartments, false or fictitious identities, and coded and/or vague communications and conversations over cellphones, including text messages.  I am aware that drug traffickers drop or switch telephones and/or telephone numbers frequently to thwart law enforcement investigations of their criminal activities.

### III. **SUMMARY OF PROBABLE CAUSE**

7.   The Naval Criminal Investigative Resident Agency ("NCISRA") Camp Pendleton, CA ("CPC") SPOS developed a confidential source (the "CS") who had previously sold and distributed various controlled substances to active duty Marines aboard Marine Corps Air Ground Combat Center ("MCAGCC") Twenty-Nine Palms, CA.[1]  After being arrested, the CS stated he/she sold

---

[1] The CS has cooperated with the NCIS since February 2020. Since that time, the CS has provided information pertaining to the arrest/investigation of over 50 individuals, including many

to approximately 30-40 active duty Marines aboard MCAGCC Twenty-nine Palms, CA and provided information pertaining to where he/she obtained his/her controlled substances.

8.   The CS stated he/she obtained his/her controlled substances from an individual named Drew ALARCON, a civilian. The CS stated he/she communicated with ALARCON through a social media platform, Snapchat, and that ALARCON utilized the Snapchat handle "Drew_Alarcon."

9.   Between August 28, 2020 and November 24, 2020, the CS, under NCIS direction, coordinated and conducted four controlled substance purchases from ALARCON.  The controlled purchases were conducted in the parking lot 832 N. Azusa Avenue, Apartment 29, West Covina, California 91791 (the "Subject Premises"), which was identified as ALARCON's residence.

10.   On December 4, 2020, the Honorable Alexander F. MacKinnon, U.S. Magistrate Judge granted a Federal search warrant for the Subject Premises under Case No. 2:20-MJ-05902.

11.   On December 10, 2020, Special Agents of NCIS and DEA served the aforementioned Federal search warrant upon the Subject Premises.  During the search of the Subject Premises, agents seized over 10 grams of suspected LSD and other contraband, including a short-barreled rifle, a weapons silencer, ammunition, other controlled substances, packaging materials, scales, United States currency, gold and silver

---

involving drug seizures.  The information provided by the CS has been corroborated and has been proven to be reliable.  Prior to the CS being arrested by NCIS, his/her criminal history indicated no prior arrests or convictions.

bullion, and digital devices.  ALARCON was detained and taken
into custody at the Subject Premises.

### IV. **STATEMENT OF PROBABLE CAUSE**

12.   Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

A.   **Background of Investigation.**

13.   On February 20, 2020, the CS was arrested for the
distribution of controlled substances to approximately 30-40
active duty Marines aboard MCAGCC Twenty-nine Palms, CA.  During
an interview, the CS provided information pertaining to where
he/she obtained his/her controlled substances.  The CS stated
he/she obtained his/her controlled substances from ALARCON, a
civilian.  The CS stated he/she met ALARCON through a prior
United States Marine who has since departed the United States
Marine Corps.  The CS stated he/she only communicated with
ALARCON through the social media platform, Snapchat, and that
ALARCON utilized the Snapchat handle: "Drew_Alarcon."

14.   The CS stated he/she had purchased the following
quantities and controlled substances from ALARCON on numerous
occasions: Ecstasy, Psilocybin Mushrooms (commonly referred to
as "shrooms") in bulk, multiple sheets of LSD, Percocet pills in
bulk, eight to nine pills of Xanax at a time, and three to five
grams of cocaine on more than one occasion.  The CS related in
prior instances, he/she had communicated with ALARCON via
Snapchat to coordinate the purchases.  Additionally, the CS
advised he/she always met ALARCON in the parking lot of the

Subject Premises and conducted the controlled substance
purchases in his/her vehicle.

### B.   **ALARCON Sells LSD, Xanax, and Oxycodone to the CS on August 28, 2020.**

15. On or about August 26, 2020, between approximately
4:00 p.m. and 5:00 p.m., under NCIS direction, the CS contacted
ALARCON, via Snapchat, and arranged to buy one sheet of LSD,
also known as 100 "tabs", for $500 on August 28, 2020.  The CS
photographed the aforementioned Snapchat communications
utilizing a separate digital camera.  On August 28, 2020, under
NCIS direction, the CS contacted ALARCON, via Snapchat, and
confirmed the purchase of one sheet of LSD.  Once ALARCON
confirmed the sale of the aforementioned substances, at
approximately 3:25 p.m., the CS, while under visual surveillance
of myself and NCIS Investigator David Hammell, drove to the
parking lot of the Subject Premises.  While in the parking lot,
under NCIS direction, the CS arranged the additional sale of
eighteen Xanax "bars" (pills) and four Oxycodone pills for an
additional $100.  Prior to the controlled purchase of the
suspected Oxycodone pills, ALARCON advised the CS, via Snapchat
message, "Med I'd stay away from em they're presses too a lot of
the Oxys everyone has are presses so I'd stay away from em."
The CS asked ALARCON, Oh like they're bad?"  ALARCON replied,
"They're pressed they're strong but if u want them just know

they're presses not real pharmaceutical Oxys."[2]  The CS confirmed the additional sale/purchase of the Oxycodone and Xanax "bars".

16.  On August 28, 2020, at approximately 4:05 p.m., ALARCON walked to the CS's vehicle and got into the passenger seat.  While in the CS's vehicle, ALARCON apologized for being late and advised he had previously conducted another sale in the front of his apartment complex.  ALARCON then provided the CS with a plastic baggie, which contained the pre-arranged sheet of LSD, eighteen suspected Xanax "bars" and four "pressed" Oxycodone pills.  The CS then handed the $600 cash to ALARCON, who counted the money prior to exiting the CS's vehicle. Subsequent to the sale/purchase of the aforementioned controlled substances, ALARCON exited the CS's vehicle and walked to the Subject Premises utilizing a side alleyway entrance.  The purchase was audio and video recorded by NCIS Investigator David Hammell who was in the immediate vicinity of the CS and monitored the discussion contemporaneously.

### C.   ALARCON Sells LSD and Oxycodone to the CS on September 18, 2020.

17.  Between September 14 and 15, 2020, under NCIS direction, the CS messaged ALARCON, via Snapchat, and asked if he/she could purchase another sheet of LSD.  At approximately 5:59 p.m., ALARCON messaged the CS back and stated, "I have to order more and I don't get em that cheap unless I order 5."  The CS subsequently arranged, via Snapchat, to buy one and a half

---

[2] From my training and experience, I know that a "pressed" pill is typically a counterfeit pill that is regularly mixed with a cheaper powdery substance (such as Fentanyl) and sold by drug traffickers and organized criminal organizations.

sheets, or 150 tabs, of LSD and thirty-five Oxycodone pills for
$1105 from ALARCON on September 18, 2020. The CS utilized an
NCIS issued digital camera to capture photographs of the
aforementioned Snapchat communications between himself/herself
and ALARCON. On September 18, 2020, at approximately 1:37 p.m.,
the CS messaged ALARCON, via Snapchat, to confirm the purchase
of the aforementioned controlled substances from ALARCON. At
approximately 2:20 p.m., ALARCON confirmed the purchase, and
while under my and NCIS Investigator David Hammell's visual
surveillance, the CS drove to the Subject Premises apartment
complex parking lot. Prior to the CS notifying ALARCON that
he/she was present in the parking lot, Investigator David
Hammell positioned himself within ALARCON's apartment complex.
The CS then informed ALARCON via Snapchat that he/she was at the
apartment complex parking lot. ALARCON indicated he would meet
the CS within a few minutes. Investigator David Hammell
observed ALARCON exit the Subject Premises and walk through the
side alleyway entrance. I subsequently observed ALARCON exit
the apartment building through the alleyway entrance and walk
straight to the CS's vehicle. At approximately 2:57 p.m.,
ALARCON entered the front passenger side of the CS's vehicle.

     18. After ALARCON entered the CS's vehicle, he handed the
CS a plastic baggie that contained approximately thirty-four
suspected pressed Oxycodone pills, and two folded pieces of tin
foil. One of the folded pieces of tin foil contained one sheet
of 100 gel tabs containing suspected LSD and the other piece of
tin foil contained half a sheet, or 50, designed paper tabs of

8

suspected LSD.  The CS handed ALARCON the $1205 of NCIS funds, and ALARCON informed the CS to keep the additional $5.  The CS asked ALARCON if he wanted to count the money which he declined to do.  ALARCON then exited the CS's vehicle and walked back through the alleyway entrance to building of the Subject Premises wherein Investigator David Hammell observed ALARCON walk up the stairs back toward the Subject Premises.  The aforementioned controlled purchase was audio and video recorded by NCIS SA Ian Bland who was in immediate vicinity of the CS and monitored the discussion contemporaneously.

19.  Subsequent to the controlled purchase, the CS realized he/she accidentally provided ALARCON an additional $100.  The CS messaged ALARCON via Snapchat about the accidental overpayment to which ALARCON responded via Snapchat and indicated he would provide the CS with a $100 credit to his/her next purchase of controlled substances.

**D.  ALARCON Sells LSD and Xanax to the CS on October 7, 2020.**

20.  On October 6, 2020 at approximately 9:01 a.m., the CS utilized Snapchat to arrange the purchase of two sheets, or two hundred tabs, of LSD and one jar (100 pills) of Hydrocodone/Acetaminophen (commonly referred to as "Norco") for $1,750 from ALARCON on the following day.  The CS utilized an NCIS issued digital camera to capture photographs of the communications.  On October 7, 2020, under NCIS direction, the CS attempted to confirm the purchase of the controlled substances from ALARCON via Snapchat.  ALARCON indicated he was

9

able to obtain the two sheets of LSD, but could not obtain the "Norcos". The CS subsequently utilized Snapchat to arrange the purchase of two sheets of LSD and one hundred Xanax bars for $1,300 from ALARCON, which included the $100 credit from the previous overpayment on September 18, 2020.

21. Subsequent to ALARCON confirming the aforementioned purchase/sale, the CS, while under the visual surveillance of myself, NCIS SA Ian Bland and NCIS SA Celia Rosa, drove to the parking lot of the Subject Premises. Once the CS arrived at the Subject Premises, he/she informed ALARCON, via Snapchat messenger, he/she had arrived. ALARCON indicated he would meet the CS in a few minutes. At approximately 2: 09 p.m., I observed ALARCON exit the building of the Subject Premises through the alleyway entrance and walk directly to the CS's vehicle. ALARCON then entered the front passenger side of the CS's vehicle, wherein he provided the CS with one plastic baggie that contained two sheets of orange gel "tabs" of suspected LSD and one clear plastic baggie that contained approximately one hundred suspected Xanax bars.

22. While ALARCON was in the CS's vehicle, he informed the CS that if he/she did not like the suspected Xanax that he/she could return them for the "Oxys" (Oxycodone pills). After the CS provided ALARCON with the NCIS funds, ALARCON exited the CS's vehicle and walked directly back to the alleyway side entrance. This controlled purchase was audio and video recorded by NCIS SA Ian Bland who was in the immediate vicinity of the CS and monitored the discussion contemporaneously.

10

### E.   ALARCON Sells LSD and Cocaine to the CS on November 24, 2020.

23.   On November 20, 2020, under NCIS direction, the CS utilized Snapchat to arrange the purchase/sale of three sheets of LSD and an eight (8) "ball"[3] of cocaine for $1,850 from ALARCON on November 24, 2020.   The CS utilized an NCIS issued digital camera to capture photographs of these communications. On November 24, 2020, the CS messaged ALARCON via Snapchat to confirm the purchase of the aforementioned controlled substances.   ALARCON indicated his normal source of LSD supply was not able to provide the three sheets; however, he was currently waiting on another individual to drop off the controlled substances.   The CS asked ALARCON to let him/her know when ALARCON's source of supply had provided ALARCON the three sheets of LSD.   At approximately 12:33 p.m., ALARCON  informed the CS, via Snapchat, he had obtained the controlled substances, and the CS could drive to the Subject Premises apartment complex for the sale.   At approximately 1:15 p.m., under visual surveillance of myself, NCIS SA Ian Bland, and NCIS SA Chaz Hatton, the CS drove to ALARCON's apartment complex.

24.   Upon arrival at the Subject Premises apartment complex parking lot, SA Ian Bland, positioned himself inside of the Subject Premises apartment complex.   The CS then messaged ALARCON, via Snapchat, and indicated that he/she was present

---

[3] I know from my training and experience an eight (8) "ball" is a common term used within controlled substances when referring to approximately 3.5 grams.

within the Subject Premises parking lot. ALARCON informed the
CS that he would arrive momentarily. SA Ian Bland subsequently
observed ALARCON exit the Subject Premises, walk down the
stairs, and through the side alleyway entrance.

25. At approximately 1:38 p.m., I observed ALARCON exit
the side alleyway entrance and walk directly to the CS's vehicle
and enter the front passenger door. ALARCON provided the CS a
piece of tin foil that contained three sheets of suspected LSD
and a small plastic baggie that contained a white powdery
substance, suspected to be Cocaine. While in the CS's vehicle,
the CS asked ALARCON if he could get "pages" (approximately 1000
tabs of LSD) to which ALARCON informed the CS he could. ALARCON
explained a "page" would cost between $2,300 and $2,600. The CS
and ALARCON also discussed the "raffle" which ALARCON had
advertised via his Snapchat story. ALARCON informed the CS that
he was conducting a raffle and that people could buy raffle
tickets and be entered into a drawing for controlled substances.
Additionally, if an individual provided a "referral" or another
controlled substance customer, they would receive an additional
raffle ticket.

26. The CS then provided ALARCON with provided NCIS funds,
which totaled $1650. I observed ALARCON subsequently exit the
CS's vehicle and walk straight back to the side alleyway
entrance where he came from. SA Ian Bland observed ALARCON re-
enter the apartment complex through the side alleyway entrance,
walk up the stairs and back into the Subject Premises.

12

F.    **Testing of the Controlled Substances.**

27.    On November 25, 2020, Drug Enforcement Administration ("DEA") Special Agent Logan Bonifas and I utilized a DEA issued TruNarc handheld narcotics analyzer to identify the aforementioned white powdery substance purchased on November 24, 2020.  The TruNarc handheld Narcotics Analyzer reported the white powdery substance purchased on November 24, 2020 was "Cocaine HCI."

28.    On November 24, 2020, DEA Chemist Monica Price provided telephonic results pertaining to the aforementioned controlled purchase on August 28, 2020.  Chemist Price stated the one sheet or 100 tabs of suspected LSD was in fact LSD, and it weighed approximately 1.12 grams.  Chemist Price stated the eighteen suspected Xanax bars tested positive for Etizolam, which I know to be form a Xanax, and the four suspected Oxycodone pills tested positive for the presence of Fentanyl.

29.    Chemist Price also provided laboratory results pertaining to the one hundred suspected Xanax bars purchased on October 7, 2020.  Price stated the one hundred suspected Xanax "bars" tested positive for Etizolam, and had a net weight of approximately 25.69 grams.

G.    **Between July 20, 2020 and November 24, 2020, ALARCON Posted Pictures and Advertisements on Social Media Regarding the Sale Controlled Substances.**

30.    Between July 20, 2020 and November 24, 2020, the CS captured multiple photographs of controlled substance advertisements ALARCON posted to his Snapchat story.  Within the advertisements, ALARCON publically advertised the sale of Acid,

13

Ecstasy, Molly ("MDMA"), 2C-B (Psychedelic), Psilocybin Mushrooms, Percocet, Adderall, Ketamine, Xanax, Cocaine, and Oxycodone.  A photograph depicting ALARCON's controlled substance advertisement on Snapchat captured by the CS is shown below.



31.   On December 10, 2020, Chemist Price also provided laboratory results pertaining to the suspected LSD purchased on October 7, 2020.   Price stated the two hundred suspected tabs of LSD tested positive for LSD, and had a net weight of approximately 1.95 grams.

**H.   Execution of Federal Search Warrant on the Subject Premises**

32.   On December 4, 2020, the Honorable Alexander F. MacKinnon, U.S. Magistrate Judge granted a Federal search warrant for the Subject Premises under Case No. 2:20-MJ-05902.

33.   On December 10, 2020, Special Agents of NCIS and DEA served the search warrant upon the Subject Premises.   At the

14

execution of the search warrant, ALARCON was the sole person present in the Subject Premises.

34.   During the search of the Subject Premises, DEA SA Elijah Adams located and seized several thousand pills of suspected controlled substances, which were "pressed" to look like Adderall, Xanax, Oxycodone.  The pills, from my training and experience, did not appear to be authentic pharmaceuticals and were in various locations throughout the Subject Premises.

35.   SA Adams located and seized suspected Adderall pills, suspected Xanax pills, and suspected Oxycodone pills from a table in the kitchen, near a drawer containing the 25-caliber Raven Arms semi-automatic handgun, discussed further below, bearing serial number 1141252.  SA Adams also located and seized the following controlled substances from the aforementioned table in the kitchen: paper tabs of LSD; a glass container with a large amount of white powdery substance, suspected to be cocaine; a glass jar containing a chunky white powdery substance believed to be fentanyl; a large glass jar containing marijuana; packaging materials to include plastic bindles; a powdery substance believed to be a suspected cutting agent; and digital scales.

36.   During the search, SA Adams located and seized approximately one pound of psilocybin, commonly referred to as "Mushrooms or Shrooms" packaged in a large sized ziploc bag from underneath the kitchen table.

37.   SA Adams located and seized various digital scales that appeared to contain residue from within the drawer where

15

the 25-caliber Raven Arms semi-automatic handgun was located.
He also located and seized approximately 1000 gel tabs of LSD,
appearing to be over 10 grams, that were located on a sectional
couch in the center of the living room within the Subject
Premises.  SA Adams located and seized a gold bullion bar,
United States currency and pills of suspected MDMA from a bar
counter-top, which was between the kitchen and the living room.

38.  Within the bedroom of the Subject Premises, SA Adams
located two black bags containing approximately $25,000 in U.S.
currency.  Additionally, in one of the bags was a notepad with
hand written notes indicative of the recordation of drug
distribution and sales.

39.  Within the closet of the bedroom of the Subject
Premises, DEA SA Elijah Adams located a fire safe.  NCIS SSA
Matthew Timmons contacted a locksmith and provided him the make,
serial number and type of safe.  The locksmith provided the
combination to the safe.  Once the safe was accessed, SA Adams
located two white cardboard boxes and one small cardboard box
within the fire safe, containing multiple combined stacks of
U.S. currency in different denominations within the cardboard
box.  The currency had an estimated value of over $25,000.  The
safe also contained numerous coins and precious metals encased
within cardboard and plastic protective packaging.  The safe
also contained a small plastic bag with white, rectangular
pills, suspected to be Xanax and five additional plastic bags,
which contained multiple blue and green rectangular pills,

suspected to be Xanax.  The combined number of pills located within the safe were estimated to be over 500 pills.

### H.   Seizure of Firearms, Ammunition, and other Weapons

40.   During the service of the search warrant upon the Subject Premises, SA Adams located and seized a 25-caliber raven arms semi-automatic handgun, bearing Serial Number 1141252, located within a kitchen drawer adjacent to large quantities of controlled substances, on a table within the kitchen area.  The handgun had a loaded magazine inserted, a round in the chamber and was ready to fire.  There was additionally numerous round sof unexpended 25 caliber cartridges contained in a Ziploc bag, within a cupboard below the drawer.

41.   SA Adams also located and seized an AR-15 type rifle on the floor, alongside of the bed within the only bedroom.  The weapon had a fully loaded 30 round magazine inserted into the weapon.  The weapon had no serial number and appeared to have been altered or manufactured to fire automatic.  The weapon's barrel was approximately 7.5 inches in length, which is significantly shorter than legal for AR-15 type weapons.  The end of the barrel was threaded to receive an attachment.  The stock of the weapon is a telescoping type stock and at the time of discovery, it was "telescoped in" to present the shortest possible stock.

42.   Agents also located a metal threaded tube, which appeared to be a non-serialized silencer within approximately three feet from the AR-15, underneath the bed in the bedroom. The tube measured approximately 9 inches in length and 1.5

17

inches in diameter.  The silencer appeared as if it could attach to the fully automatic AR-15 described above.

43.    In addition to the ammunition located within the magazines of each weapon, SA Adams located and seized 5.56 green tipped and non-green tipped ammunition totaling approximately 100 cartridges and 9mm unexpended cartridges from a drawer underneath the bed.

44.    Following the search, ALARCON, who was present when the search warrant was executed, was taken into custody.

### V.   CONCLUSION

45.    For the reasons described above, there is probable cause to believe that ALARCON has committed a violation of 21 U.S.C. §§ 841(a), (b)(1)(A)(v) (Possession with Intent to Distribute LSD).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 11th day of
December, 2020.

HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE